Filed 8/3/26  Sugarman v. Benett CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| STEVEN A. SUGARMAN, Individually and as Trustee, etc., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> HALLE BENETT et al. <br><br> Defendants and Respondents. | B338610 <br><br> (Los Angeles County Super. Ct. No. 19STCV36697) |

APPEAL from a post-judgment order of the Superior Court of Los Angeles County, Wendy Chang, Judge.  Affirmed.

Cozen O'Connor, Thomas W. Casparian; Dorsey & Whitney and Jeremy E. Deutsch for Plaintiffs and Appellants.

Morrison & Foerster, Mark R. McDonald, Zachary Maldonado, Joseph R. Palmore, Zach ZhenHe Tan and Rebecca W. Setrakian for Defendants and Respondents.

_____

# INTRODUCTION

Plaintiffs Steven A. Sugarman and his trust sued Banc of California, several executives, and members of its board directors in the wake of a scandal that led to Sugarman's resignation from his positions at Banc of California in January 2017.

After years of litigation, on April 18, 2024, the trial court awarded $1,062,813.20 in attorney fees to the directors of the board and executives jointly and severally.

On appeal, plaintiffs request that we reverse the attorney fee order. They argue the trial court misinterpreted the relevant contracts and misapplied the law governing fee applications. In the alternative, plaintiffs ask us to reduce the fee award by $401,396.

We disagree with plaintiffs' arguments and affirm the order awarding fees.

# FACTUAL AND PROCEDURAL BACKGROUND

## A. *The Parties*

Plaintiff Sugarman is the former chair of the board, president, and chief executive officer of Banc of California, Inc. and its national bank subsidiary Banc of California, N.A. (Banc). While Banc was a defendant in the underlying suit, it is not a party or respondent in this appeal.

A second plaintiff is The Steven and Ainslie Sugarman Living Trust, Sugarman's revocable living trust which held various stock warrants and common stock in Banc. As relevant here, the trust is the successor-in-interest to Banc's contracts with two of Sugarman's business enterprises, COR Capital LLC and COR Advisors LLC. For convenience, we refer to Sugarman and the trust collectively as plaintiffs.

Plaintiffs sued Banc and some of its executives and members of the board of directors over circumstances surrounding Sugarman's resignation.  Defendants Halle Benett, Jeffrey Karish, Jonah Schnel, Robert Sznewajs, and Richard Lashley served on Banc's board of directors at times relevant to plaintiffs' claims.  Defendant Hugh Boyle was Banc's chief risk officer and was promoted to interim chief executive officer upon Sugarman's resignation. Defendant John Grosvenor was Banc's general counsel and corporate secretary.  We collectively refer to the Banc executives and directors as defendants.

B.    ***The Operative Complaint***

On February 19, 2020, plaintiffs filed the 167-page operative first amended complaint (FAC) with 636 pages of exhibits attached.  The FAC alleged 12 causes of action, some against Banc, some against defendants, and some against both Banc and defendants: 1) breach of contract; 2) fraudulent inducement to hold securities; 3) negligent misrepresentation to induce holder to hold securities; 4) tortious interference with contract; 5) unfair competition; 6) conspiracy to engage in unfair competition; 7) misrepresentation preventing subsequent employment; 8) tortious interference with prospective economic advantage; 9) defamation; 10) breach of indemnification agreements; 11) account stated with respect to the separation indemnification agreement; and 12) breach of the covenant of good faith and fair dealing.

We concentrate on the allegations relevant to the fourth cause of action for tortious interference with contract, as follows:

In 2010, Sugarman's investment firm COR Capital led a recapitalization of Banc for $60 million with other investors. Concurrent with the recapitalization, "Sugarman and the entities

3

he wholly owned with his wife, including the Trust, COR Capital, LLC and COR Advisors LLC, entered into *a series of contracts* with Banc." (Italics added.) At least seven contracts are identified throughout the FAC: 1) Subscription Agreement with Registration Rights and Indemnification Rights dated July 16, 2010 (Subscription Agreement) (entirely restating the Subscription Agreement dated May 3, 2010); 2) Consulting and Expense Agreement with Warrant Agreement, Registration Rights and Indemnification Rights dated July 16, 2010 (Consulting Agreement) (restating the Consulting Agreement dated May 3, 2010 with Annex I entitled "Indemnification" and Annex II entitled "Form of Warrant"); 3) Warrant to Purchase Common Stock dated November 1, 2010 (Warrant Agreement); 4) Stock Appreciation Rights Agreement granted August 21, 2012 inclusive of all subsequent amendments dated August 21, 2012, December 13, 2013, May 23, 2014, March 2 and 24, 2016 (collectively, SAR Agreement); 5) 2016 employment agreement; 6) director and officer indemnification right agreement; and 7) separation agreement with indemnification rights entered January 23, 2017. These contracts "were each entered into by Banc as inducements for Mr. Sugarman and the entities he wholly owned with his wife . . . to provide services and capital to Banc and each, as required, were approved by the Board of Directors of the Banc, through the full Board . . . prior to adoption."

1. The Subscription Agreement

The Subscription Agreement (attached as an exhibit to the FAC) provides terms for the purchase and sale of securities and common stock. The Subscription Agreement identifies the subscriber as COR Capital LLC with Sugarman's signature as

4

the "managing member." Article X of the Subscription Agreement, entitled "Miscellaneous," includes relevant provisions 10.3, 10.6, and 10.8.

Section 10.3 states in part, "Except as otherwise provided herein, *this Agreement shall be binding upon and inure to the benefits of the parties hereto and their heirs, executors, administrators, successors, legal representatives and assigns.* If the Subscriber is more than one person, the obligation of such Subscriber shall be joint and several and the agreements, representations, warranties, covenants, and acknowledgements herein contained shall be deemed to be made by and be binding upon each such person and his or her heirs, executors, administrators, successors and legal representatives." (Italics added.)

Section 10.6 provides: "*In the event of a dispute regarding this Agreement that results in litigation or arbitration, the prevailing party, as determined by the finder of facts, shall be entitled to an award of reasonable attorneys' fees.*" (Italics added.)

Section 10.8 provides: "The parties agree to execute and deliver all such further documents, agreements and instruments and take such other and further action as may be necessary to carry out the purposes and intent of this Agreement."

Section 5.6 of the Subscription Agreement specifies that "[t]he Company shall provide for the registration, offering and sale of the shares of Common Stock purchased by [the] Subscriber. . . *in accordance with the terms of Schedule III to this Agreement.*" (Italics added.) The Schedule III attachment to the Subscription Agreement, entitled "Registration Rights" is also attached to the FAC as part of its exhibits. Section (h) of the Registration Rights provides the "agreements set forth in this

5

Schedule III shall . . . be binding upon the successors and assigns of each of the parties to the Agreement, including without limitation and *without the need for an express assignment or assumption, direct and indirect transferees of Subscriber's Registrable Securities to whom the Registrable Securities have been validly transferred under the terms of the Agreement.*" (Italics added.)

   2. <u>The Consulting Agreement</u>

  The Consulting Agreement specifies that the Banc seeks to engage COR Advisors LLC "as a consultant to provide . . . strategic, financial, and general corporate advise, and COR Advisor desires to be engaged by [Banc] to provide such advice." The Consulting Agreement provides: "In consideration of COR Advisors' entry into this Agreement and the services contemplated to be provided hereunder, the Board has determined to issue . . . and [Banc] further agrees to deliver, to COR Advisors . . . a warrant (the 'Warrant,' such Warrant to be substantially in the form attached as <u>Annex II</u> to this Agreement) to purchase, in the aggregate, 1,560,000 shares of Class B Non-Voting Common Stock at an exercise price of $11.00, which shall become exercisable in increments of 130,000 shares of Class B Non-Voting Common Stock upon the Authorization Date . . . as set forth in <u>Annex II</u> to this Agreement. [Banc] shall provide for the registration, offering and sale of the shares of Common Stock issuable upon exercise of the Warrant *in accordance with the terms of <u>Annex III</u> to this Agreement.*" (Italics added.)

  The Consulting Agreement includes no attorney fee provision.

Annex III of the Consulting Agreement, entitled "Registration Rights," provides: "Substantially simultaneously with the Closing, [Banc] shall enter into an agreement (the '**Reg Rights Agreement**') with COR Advisor, which shall provide COR Advisor with customary rights from and following the Closing with respect to the registration, offering and sale of the shares of Common Stock issuable upon exercise of the Warrant. Subject to the foregoing, *the terms and conditions of the Reg Rights Agreement shall be substantially consistent in substance with, and, taken as a whole, not less favorable to COR Advisor (as a holder of registrable securities) than, the terms and conditions of any agreement(s) entered into with investors in the Transaction relating the registration, offering and sale of the shares of Common Stock issued in the Transaction*; *provided*, that (i) the registration rights set forth in the Reg Rights Agreement shall in no event expire prior to the Final Expiration Date (as defined in the Warrant) (subject to customary early sunset provisions relating to public sale of all subject registrable securities prior to the expiration of such term) and (ii) the Reg Rights Agreement will provide that in connection with any registration thereunder, [Banc] will reimburse COR Advisor for the reasonable fees and disbursements of one counsel." (Italics added.)

Neither the Consulting Agreement nor Annex III's Registration Rights were attached to the FAC.

3. <u>Warrant to Purchase Common Stock Agreement</u>

The agreement entitled "Warrant to Purchase Common Stock" dated November 1, 2010 (Warrant Agreement), attached as an exhibit to the FAC, provides that the warrants, initially issued to COR Advisors LLC, could be converted into voting stock. It provides: "This certifies that, for value received, COR

7

Advisors LLC . . . is entitled to purchase, in the aggregate, up to 1,395,000 fully paid and nonassessable shares (the 'Warrant Shares') of Class B Non-Voting Common Stock, par value $0.01 per share (the 'Class B Common Stock') of [Banc] . . . during the Warrant Exercise Period, at the Exercise Price.  Notwithstanding the foregoing, this Warrant shall be exercisable for, in lieu of shares of Class B Common Stock, shares of common stock, par value $0.01 per share (the 'Voting Common Stock,' and collectively, with the Class B Common Stock, the 'Common Stock') . . . and, in such event, the term 'Warrant Shares' shall be deemed to include such shares of Voting Common Stock for all purposes hereunder. This Warrant is being granted in connection with the Amended and Restated Consulting and Expense Agreement, dated as of July 16, 2010, between COR Advisors . . . and [Banc] (the 'Consulting Agreement').  This Warrant is entitled to the benefits of the registration rights set forth in Annex III of the Consulting Agreement (the 'Registration Rights Agreement')."

4.    The FAC's Relevant Allegations

In the second half of 2016, Sugarman reported wrongdoing and self-dealing by defendant Benett and others at Banc "to the Board of Directors and other control functions for Banc . . . on numerous occasions."  Defendants refused to address the wrongdoing and instead "Benett and the other Director Defendants agreed to help protect one another . . . to further their personal interests, and to take over control of the bank."  In December 2016, defendants "saw the opportunity to topple Mr. Sugarman and take over the bank to their great personal benefit" and "became determined to retaliate against Sugarman and to have [him] terminated for his whistleblowing."  On January 4,

2017, defendants became aware that the Securities and Exchange Commission (SEC) planned to open a formal order of investigation into Banc. On January 6, 2017, the board's special committee (whose members were the director defendants) " 'morphed' its work from investigating allegations of wrongdoing to instead focus on ways to terminate Mr. Sugarman, take over control of Banc, and to cloak their illicit plans . . . to coordinate their [c]over [u]p strategy."

On January 22, 2017, defendants called an emergency board meeting where Benett recommended the board terminate Sugarman as chief executive officer and president. Sugarman "objected to Director Defendants['] conduct as inappropriate, illegal, and totally conflicted" but "ultimately concluded that he would be unable to sign Banc's financials or serve as an Executive or Director at Banc so long as the Director Defendants were in control of the Board." Sugarman "decided it was in his [and] Banc's . . . best interest to separate . . . and to avoid personal liability for signing false financial disclosures which the Director Defendants were pressuring him to do."

The next day, on January 23, 2017, Sugarman resigned and entered into a separation agreement including a full release and a new indemnification agreement with Banc and its affiliates. He "provided a full release to the Banc for its actions which occurred prior to the execution of the Separation Agreement."

"Following Mr. Sugarman's departure, Defendants breached various contracts, including those between Banc and Mr. Sugarman, Mrs. Sugarman and their wholly owned affiliates (including the Trust, COR Capital LLC, and COR Advisors, LLC) relating to Mr. Sugarman's warrants, stock appreciation rights, registration rights, and indemnification rights." Defendants

"attempted to control Sugarman through strategic failures to perform on [his] post-employment indemnification agreement, Warrant Agreement, registration rights agreements, indemnification agreements, tax reporting, and other contractual agreements and relationships with Banc." More specifically. defendants breached the Warrant Agreement with plaintiffs by "fraudulently amending their Articles of Organization to the detriment of Class B stockholders in June 2017" without Sugarman's consent and by "refusing to tender common stock upon the exercise of the Warrants"; defendants breached Sugarman's "indemnification agreements in order to attempt to punish [him] for providing true and accurate testimony about defendant wrongdoing and to attempt to control him in litigation." Defendants "targeted [plaintiff] for financial and reputational harm including through intentional breaches of contract, fraud, torts, unfair business practices, and unfair competition that have resulted in not less than $65 million in financial harm to [plaintiff] following the end of his employment from Banc." Defendants made material misrepresentations to induce plaintiffs to hold, rather than sell, Banc common stock and warrants.

Per the Stock Appreciation Rights Agreement, Sugarman had a right to stock based on the appreciation of 1,559,012 shares of Banc common stock upon his departure from Banc. The agreement enabled Sugarman to convert his stock appreciation rights into voting common stock upon his election to exercise those rights. Misrepresentations by defendants "caused Mr. Sugarman to be restricted from exercising his [stock appreciation rights]."

Sugarman "is also entitled to recovery of his necessary and reasonable legal fees and expenses under the Separation Indemnification Agreement, Subscription Agreement, and Consulting Agreement incurred in connection with his need to enforce his rights under these agreements."

5. <u>Fourth Cause of Action for Tortious Interference with Contract</u>

The FAC's fourth cause of action for tortious interference with contract alleges:

Plaintiffs owned warrants initially issued to COR Advisors on November 1, 2010, pursuant to the Warrant Agreement and later transferred to the plaintiff trust. The Warrant Agreement entitled plaintiffs to purchase nonassessable shares of Class B common stock (i.e., warrant shares) and the warrants could be converted into Class A voting stock. Plaintiffs complied "with all requisite conditions such that the [w]arrant [s]hares may be converted into voting common stock." The Registration Rights Agreement "contained a provision stating that the registration of COR Advisor's [w]arrants would be done on terms no less favorable than terms offered to any other investor." Defendants "knew" about the Warrant Agreement and Registration Rights Agreement between plaintiffs and Banc and "engaged in conduct to cause Banc to breach" those two agreements to plaintiffs' detriment.

In breach of the Warrant Agreement, Banc refused to allow plaintiffs to convert the warrant shares it holds into voting common stock. In breach of the Registration Rights Agreement, Banc failed to register the warrant shares as voting common stock. Defendants "engaged in conduct to cause Banc to unilaterally change [these] agreements by falsely asserting and

11

then disclosing that Mr. Sugarman's warrants were convertible only into Class B non-voting shares, shares which were substantially less valuable than the Class A voting shares." Defendants' conduct of unilaterally changing the rights and terms of Class B shares in 2017 "without any notice to or approval by plaintiffs" amounted to a breach of Plaintiffs' Warrant Agreement and Registration Rights Agreement. "The Director Defendants, Grosvenor, Lashley, and Boyle intended to cause Banc to breach the Warrant Agreement and the Registration Rights Agreement as retaliation against Mr. Sugarman. The Director Defendants, Grosvenor, Lashley, and Boyle acted outside the scope of their roles as Directors for their own personal benefit . . . and acted as part of their individually tortious conspiracy . . . to cause Banc to breach the Warrant Agreement and the Registration Rights Agreement."

Banc's refusal to issue Class A voting shares amounted to at least $17 million in harm to plaintiffs. Sugarman was "further damaged due to the fact that, in good faith, he sold for value some of his warrant contracts on to a third-party buyer based on, in part, the representation that the warrants would be convertible into Class A voting shares" but due to the tortious interference by defendants, Sugarman "incurred significant cost and expense in providing indemnification to the warrants' purchaser as required under the purchase agreement with the purchaser."

## C. *Defendants' Demurrer and Anti-SLAPP Motion*

On April 6, 2020, defendants filed a demurrer and an anti-SLAPP motion. They demurred to the second, third, fourth, fifth, sixth, seventh, eight, and ninth causes of action for failure to state facts sufficient to constitute a cause of action; as to the fourth cause of action for tortious interference with contract,

12

defendants also argued Sugarman lacked standing to sue. Defendants' anti-SLAPP motion sought to strike the same causes of action excepting the fourth cause of action for tortious interference with contract.

On September 1, 2020, the trial court granted the anti-SLAPP motion in part. On December 27, 2021, the Court of Appeal affirmed the judgment to the extent it granted the anti-SLAPP motion and reversed the judgment to the extent it denied the anti-SLAPP motion on the remaining claims. Thus, seven of the eight causes of action against defendants were struck in their entirety. (*Sugarman v. Benett* (2021) 73 Cal.App.5th 165; *Sugarman v. Brown* (2021) 73 Cal.App.5th 152.)

On May 17, 2022, defendants filed a motion for attorney fees as prevailing parties on their anti-SLAPP motion. On November 10, 2022, the trial court granted defendants' attorney fee motion in part. The record does not include the trial court's ruling on defendants' April 6, 2020 demurrer. However, all parties represent on appeal that the trial court did not adjudicate the demurrer.

D. ***Defendants' Second Demurrer and Writ Petition***

On June 16, 2022, defendants filed a second demurrer as to the remaining fourth cause of action for tortious interference with contract. Defendants argued, inter alia, defendants "as corporate officers, cannot be held personally liable for inducing their corporation to breach a contract." On September 9, 2022, the trial court overruled the demurrer.

Defendants filed a writ of mandate petitioning the Court of Appeal to reconcile "two distinct but overlapping doctrines. A cause of action for tortious interference with contract can be brought only against a 'stranger' to the contract—not against a

contracting party or its agents. . . . [¶] Separately, courts have recognized a privilege defense—often called the 'managerial privilege'—to tortious interference when third parties induce a breach to protect a contracting party. Defendants invoking this privilege may be required to show they were not motivated by personal gain. [¶] At least theoretically, both doctrines may apply where, as here, plaintiffs bring tort claims against a corporation's officers and directors for allegedly interfering with the corporation's contract."

On July 6, 2023, the Court of Appeal issued its order and alternative writ of mandate (case No. B324186). The court ordered the trial court to vacate its September 9, 2022 order overruling defendants' second demurrer to the fourth cause of action for tortious interference with contract and issue a new order sustaining the demurrer. The court concluded, among other things, that Defendants are "current and/or former officers, directors, or employees of Banc" and corporate agents and employees acting for and on behalf of a corporation cannot be held liable for inducing a breach of the corporation's contract. "Whether the agent is motivated by a potential personal benefit does not nullify the agency or otherwise render the agent a stranger to the contract. The agent's motivations may be relevant to the managerial privilege and the agent's immunity rule, but those doctrines are separate from the stranger doctrine."

On July 17, 2023, the trial court vacated its September 9, 2022 order and sustained without leave to amend defendants' demurrer to the fourth cause of action for tortious interference with contract. All eight causes of action against defendants had now failed, and the trial court entered judgment in favor of defendants on July 28, 2023.

14

### E. *Defendants' Motion for Attorney Fees*

On October 2, 2023, defendants moved for an award of $1,067,598.50 in attorney fees and $2,925.67 in costs. This sum was the result of 1,274.6 hours of attorney and paralegal time incurred in the proceeding and for which defendants had "not otherwise recovered for in connection with their prior anti-SLAPP motion." The total fees and costs incurred in this proceeding are categorized as follows:

| Tasks | Total Hours | Total Fees |
|---|---|---|
| Research and Briefing re: April 6, 2022 Demurrer | 539.6 | $401,396 |
| Research and Briefing re: June 16, 2022 Demurrer | 94.8 | $89,561.25 |
| Preparation of Answers to FAC | 53.8 | $44,023.50 |
| Research and Briefing re: Motion for Reconsideration | 56 | $54,445.05 |
| Research and Briefing re: Writ Petition | 220.1 | $161,901.75 |
| Propounding Discovery and Responding to Discovery | 237.2 | $236,588.40 |
| Research and Briefing re: Motion for Protective Order | 73.1 | $79,682.55 |
| **Totals** | **1,274.6** | **$1,067,598.50** |

Defendants argued they are entitled to fees as the prevailing parties as a matter of right based on the Subscription Agreement, which included a Registration Rights Agreement with "an extraordinarily broad attorney's fees provision." Defendants argued "there has been a dispute regarding th[e] [Subscription Agreement] that has resulted in litigation—which

15

is why Plaintiffs attached the [Subscription Agreement] to their First Amended Complaint." Defendants filed the declarations of their attorney Mark R. McDonald.

On January 4, 2024, plaintiffs filed their opposition to the motion for attorney fees and argued their dispute with defendants does not "regard" the Subscription Agreement. Plaintiffs filed the declaration of their counsel Jeremy E. Deutsch in support of their opposition.

On January 10, 2024, defendants filed their reply as well as the declaration of Banc's attorney Jonathan C. Sanders. Defendants included as exhibits their propounded discovery and plaintiffs' responses.

F. **_Hearings on the Attorney Fee Motion_**

On March 21, 2024, the trial court indicated its intent to continue the hearing because "the way that the tasks were described to me were very global. I need them broken down, you don't have it done by lawyer, you have them by actual lump sum and then it was like this motion, this motion, that motion. I need more detail as to what exactly is being done. And so although I'm not requiring you to actually submit the bill – quite frankly, that might be a bit much. I don't want to look at a million dollar bill. So whatever works for you guys that gives me a better understanding of how the task broke down between the individuals so I can evaluate the time spent, what specific task." The court continued: "I do think there is a fee agreement. [¶] The question, then, is whether or not if the defendants can enforce as part of it – I don't think the third-party beneficiary listed enough facts to establish that that was enough information, but I do think they are agents and they are entitled to claim provisions of the fees because they were agents . . . at that time. That was the

entire basis of the theory against them and that was the basis of the court of appeals result which actually is law in this case."

As the trial court requested, defendants filed the supplemental declaration of attorney Mark R. McDonald in support of their fee motion. Plaintiffs filed a supplemental brief in opposition.

At the continued hearing on April 18, 2024, the trial court stated: "I requested further detail from [defendants' counsel] and he has filed them, and I am satisfied in his explanation of why the hours turned out to be the way that they did. [¶] The only issue I have is Ms. Jowkofsky's rate. She is a fairly new lawyer so I am going to reduce her requested rate down." "Beyond that, though, the time and all the other rates are fine. This was and is a very, very aggressively litigated case. And I mean, on the plaintiffs' side, I can only remember I think one hearing where there was only one lawyer present from the plaintiffs' side. Every hearing, there are multiple partners from Cozen which I don't think is a problem. If your client wants that, I think that is fine. But I think that is reflective, though, of the aggression and the way that this case was litigated. [¶] And, because of the way it was litigated, I don't think it should be a surprise that the people on the other side throw equivalent resources at it to defend it. And so the hours spent in light of the way the litigation has unfolded – and I have absolutely personally observed it. The filings are always very large. There is lots of stuff that has to be responded to. . . . Mr. McDonald's supplemental filings go in and explain why the hours were what they were for each – he singles out a couple of major litigation points in the case, and he points out why the hours that were expended [are] justified. And I largely agree. [¶] And so, as a result of that, I am not cutting any

of the time, and that is the tentative[,]" awarding "$1,065,738.87 jointly and severally against the plaintiffs."

G. ***The Trial Court's Ruling***

On April 18, 2024, the trial court awarded a total of $1,062,813.20 in attorney fees and $2,925.67 in costs. The trial court found defendants "are prevailing parties as defined in Code of Civil Procedure section 1032." The trial court found "*[a]t least one of Plaintiffs' claims is based directly on interference with the Subscription Agreement*" and that regardless of "*[w]hether or not plaintiffs' cause of action was brought directly on the Registration Rights Agreement, the fourth cause of action 'regards' the Subscription Agreement*" due to the "broad wording" of the attorney fees clause. "The clause permits recovery for any dispute 'regarding' the Subscription Agreement. The constant cross-referencing of all these documents to each other, all as part of the same transaction during Banc's 2010 recapitalization, demonstrates that each document 'regards' the others." The trial court further found that defendants "<u>may enforce the attorneys' fees provision in the Subscription Agreement</u>" because they "acted as Banc's agents at all relevant times."

Finally, the trial court found defendants sought reasonable fees and costs and made lengthy findings in that regard: Defendants' "<u>timekeepers charge reasonable hourly rates</u>" for the work of nine attorneys and 4 paralegals. Based on its review of Mr. McDonald's declarations, the trial court found the hourly rate for Hanna Jolkovsky, "a third-year associate charging $810 hourly in 2023 after her graduation from Pepperdine Law in 2020" "inflated due to her inexperience and reduced it to $751.50 hourly, commensurate with the rate approved for "another associate."

18

The trial court found "[d]efendants have proven their entitlement to all the hours they billed via a Second Supplemental Declaration of Mark R. McDonald."  The court found unpersuasive plaintiffs' arguments that defendants' fees were excessive.  "McDonald's Supplemental Declaration more than explains how the tasks were divided, the contribution that each team member made, and the reason why each task took as long as it did.  The Court also observes that this argument is ironic, given that Plaintiffs staffed most hearings in this case with multiple experienced lawyers at each hearing, from across different offices.  [¶] In the case of Defendants' demurrer, McDonald explains that the complaint was 165 pages long, contained 561 paragraphs and exhibits totaling 620 pages, and incorporated by reference an additional 3,200 pages of documents. . . . McDonald enumerates [40] specific issues his team researched, some basic, others quite advanced. . . .  He attests to [32] drafts of the demurrer, with major changes from beginning to end . . . . The time charged is reasonable in context."  The court found "unpersuasive" plaintiffs' argument that defendants' fees "should be slashed because all of Plaintiffs' claims except the tortious interference claim were stricken when defendants prevailed on their special motion to strike."  The trial court relied on the language of the fees clause in determining the "prevailing party is entitled to all its fees, not only those incurred regarding one cause of action."

Plaintiffs filed a timely notice of appeal.

## DISCUSSION

On appeal, plaintiffs argue the trial court erroneously awarded $1.065 million in attorney fees based on a fee shifting provision in the Subscription Agreement when no claim regarding the Subscription Agreement was asserted against defendants, who were neither signatories nor parties to it. Plaintiffs argue the trial court erred in holding that their claim for tortious interference with contract "regards" the Subscription Agreement (such that the Subscription Agreement's fee-shifting provision applied) because that claim alleges that defendants "interfered with the Warrant Agreement and the Consulting Agreement's Registration Rights Agreement (neither of which have an attorneys' fee provision), ***not*** the [Subscription Agreement's] Registration Rights Agreement." Plaintiffs argue that the trial court's order awarding fees should be reversed, or, alternatively, reduced by $401,396, i.e., the fees incurred for the April 6, 2020 demurrer, because defendants "did not meet their burden to apportion the $401,396 in fees incurred . . . concerning (1) the tortious interference with contract claim and (2) plaintiffs' **seven** other claims . . . which indisputably do not 'regard' the [Subscription Agreement] and are not inextricably intertwined with the tortious interference claim."

We conclude a dispute "regarding" the Subscription Agreement resulted in litigation between plaintiffs and defendants, such that the attorney fee provision of the Subscription Agreement applies. We further conclude defendants are empowered to enforce the attorney fee provision as they are agents of Banc, as previously decided by this court in the writ proceedings. Finally, we find the trial court did not abuse its

20

discretion in refusing to apportion the fee award based only on the cause of action for tortious interference with contract.

A.  ***Applicable Law***

Under the American rule, each party to a lawsuit ordinarily pays its own attorney fees. Code of Civil Procedure[1] section 1021, which codifies this rule, provides: "Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties . . . ."  In other words, section 1021 permits parties to "contract out" of the American rule by executing an agreement that allocates attorney fees. Thus, parties "may validly agree that the prevailing party will be awarded attorney fees incurred in *any litigation* between themselves, *whether such litigation sounds in tort or in contract*." (*Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 751, italics added (*Mountain Air*); see *Miske v. Coxeter* (2012) 204 Cal.App.4th 1249, 1259 (*Miske*); see *Xuereb v. Marcus & Millichap, Inc.* (1992) 3 Cal.App.4th 1338, 1341.)

Section 1032, subdivision (b) provides: "Except as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding."  For purposes of section 1032, " '[p]revailing party' includes . . . a defendant in whose favor dismissal is entered."  (§ 1032, subd. (a)(4).)  Section 1033.5 allows for the recovery of attorney fees as costs under section 1032 when they are expressly authorized by contract, statute, or law.  (§ 1033.5, subd. (a)(10).)

---

[1]  Undesignated statutory references are to the Code of Civil Procedure.

As to *tort* claims, the question of whether to award attorney fees turns on the language of the contractual attorney fee provision, i.e., "whether the party seeking fees has 'prevailed' within the meaning of the provision and whether the type of claim is within the scope of the provision." (*Exxess Electronixx v. Heger Realty Corp.* (1998) 64 Cal.App.4th 698, 708 (*Exxess*); *Santisas v. Goodin* (1998) 17 Cal.4th 599, 602, 608–609, 617, 619.) " 'If a contractual attorney fee provision is phrased broadly enough, . . . it may support an award of attorney fees to the prevailing party in an action alleging both contract and tort claims: "[P]arties may validly agree that the prevailing party will be awarded attorney fees incurred in any litigation between themselves, whether such litigation sounds in tort or in contract." ' " (*Exxess*, at p. 708; *Santisas*, at p. 608.) Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation; such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Ibid*.) The clear and explicit meaning of these provisions interpreted in their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage, controls judicial interpretation. (*Ibid*.) Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning. (*Ibid*.)

B. ***Standard of Review***

" 'Generally, a trial court's determination that a litigant is a prevailing party, along with its award of fees and costs, is reviewed for abuse of discretion.' " (*Lampkin v. County of Los Angeles* (2025) 112 Cal.App.5th 920, 926; *Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332.) However, when the question

presented requires interpretation of a statute or contract, our review is de novo.  (*Lampkin*, at p. 926; *Goodman*, at p. 1332; *Saeta v. Superior Court* (2004) 117 Cal.App.4th 261, 267.)  In other words, it is a discretionary trial court decision on the propriety or amount of statutory attorney fees to be awarded, but a determination of the legal basis for an attorney fee award is a question of law to be reviewed de novo.  (*Mountain Air*, *supra*, 3 Cal.5th at p. 751; *Cargill, Inc. v. Souza* (2011) 201 Cal.App.4th 962, 966 (*Cargill*); see *Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175 ["Under some circumstances, this may be a mixed question of law and fact and, if factual questions predominate, may warrant a deferential standard of review."].)

"An experienced trial judge is in the best position to evaluate the value of professional services rendered in the trial court.  We presume the fee approved by the trial court is reasonable.  We will not disturb the trial court's judgment unless it is clearly wrong.  The burden is on the objector to show error." (*Karton v. Ari Design & Construction, Inc.* (2021) 61 Cal.App.5th 734, 743.)  The benchmark in determining attorney fees is reasonableness.  The primary method for calculating a reasonable attorney fee award is the lodestar method, which multiplies the number of hours reasonably expended by a reasonable hourly rate.  (*Howell v. State Dept. of State Hospitals* (2024) 107 Cal.App.5th 143, 155.)  The court then may increase or decrease the lodestar based on a variety of factors, including the nature, difficulty, and extent of the litigation and its issues, the skill it required, the quality of the representation, and the results obtained, as well as other factors.  (*Karton,* at p. 744; *Howell*, at p. 155.)  The choice of a fee calculation method is generally one within the discretion of the trial court, with the " 'ultimate goal' "

23

being to calculate an award that fairly compensates counsel without encouraging unnecessary litigation.  (*Howell*, at p. 155.)

In reviewing a trial court's attorney fee award, we " ' "accept the trial court's resolution of credibility and conflicting substantial evidence, and its choice of reasonable inferences that can be drawn from the evidence." ' "  (*City of San Clemente v. Department of Transportation* (2023) 92 Cal.App.5th 1131, 1149.) " 'However, a trial court abuses its discretion when factual findings critical to its decision are not supported by substantial evidence.' "  (*Ibid.*; *Sukumar v. City of San Diego* (2017) 14 Cal.App.5th 451, 464.)

## C.     ***The Broad Attorney Fees Provision in the Subscription Agreement Applies to this Litigation.***

The Consulting Agreement, which was not attached to the FAC, contains no attorney fee provision.

Section 10.6 of the Subscription Agreement, attached to the FAC, provides: "In the event of *a dispute regarding this Agreement that results in litigation* or arbitration, *the prevailing party, as determined by the finder of facts,* shall be entitled to an award of reasonable attorneys' fees."  (Italics added.)

Here, defendants are certainly the prevailing parties in the underlying proceedings, as each of the causes of action plaintiffs asserted against defendants were either stricken or dismissed. The trial court entered judgment in favor of defendants on July 28, 2023.  Section 1032, subdivision (a)(4) defines "prevailing party" to include "a defendant in whose favor a dismissal is entered."  (§ 1032, subd. (a)(4).)  Thus, to determine whether defendants are entitled to an award of attorney fees, we must determine, consistent with the language of the Subscription

24

Agreement, whether this action entailed "a dispute regarding [the Subscription] Agreement that results in litigation."

Where the language of the agreement broadly applies to any "dispute" under it, the attorney fee clause encompasses any conflict concerning the effect of the agreement, including a tort claim. (*Thompson v. Miller* (2003) 112 Cal.App.4th 327, 337; *Miske*, *supra*, 204 Cal.App.4th at p. 1259.) Applying the ordinary rules of contract interpretation, the attorney fee provision does not require an individual "claim" or "cause of action" in a dispute to regard the Subscription Agreement for the fee provision to apply; it only requires a "dispute" regarding the Subscription Agreement which "results in litigation." Thus, the language of the Subscription Agreement's fee provision does not require a party in an action to enforce a provision of the Subscription Agreement in order for the fee provision to apply. It is an extremely broadly worded fee provision.

"Broad language in a contractual attorney fee provision may support a broader interpretation." (*Gil v. Mansano* (2004) 121 Cal.App.4th 739, 744; *Exxess*, *supra*, 64 Cal.App.4th at p. 712.) Black's Law Dictionary defines "dispute" as "[a] conflict or controversy, especially one that has given rise to a particular lawsuit." (Black's Law Dict. (12th ed. 2024) p. 593, col. 2.) The word "regarding" and the phrase "[with respect to]" ordinarily mean the same thing. (See *Skrbina v. Fleming Companies* (1996) 45 Cal.App.4th 1353, 1369, fn. 10.) "Regarding" is defined as "with respect to; concerning." (Webster's Third New Internat. Dict. (1993) pp. 1911 [definition of "regarding"] & 1934 [definition of "respect" and phrase "with respect to"].) "[W]hen the language of a contract is plain and unambiguous it is not within the province of a court to rewrite or alter by construction what has

25

been agreed upon." (*In re Mission Ins. Co.* (1995) 41 Cal.App.4th 828, 837–838.)

So, as long as the litigation between the parties regards a dispute regarding the Subscription Agreement, then the attorney fee provision applies and permits recovery of fees by the prevailing party. We also conclude the fee provision's reference to "litigation" resulting from "a dispute regarding th[e] [Subscription Agreement]" encompasses the entire controversy and is not limited to specific claims or causes of action arising from the contract. If such a limitation exists, it must come from other words in the attorney fees provision, and no such limitation exists here.

Plaintiffs contend the FAC does not allege a dispute regarding the Subscription Agreement and that the trial court "erred in holding that the Consulting Agreement's Registration Rights Agreement is merely a 'cross-reference' to the [Subscription Agreement]'s Registration Rights Agreement." Plaintiffs argue the FAC alleged no claims against defendants regarding the Subscription Agreement and that the tortious interference with contract cause of action "arises from [defendants'] interference with the Warrant Agreement and the Consulting Agreement's Registration Rights Agreement, *not* the [Subscription Agreement's] Registration Rights Agreement."

Upon our review of the language of the FAC, we must reject plaintiffs' argument.

Plaintiffs assert in the fourth cause of action for tortious interference with contract that Banc breached the Registration Rights Agreement and that defendants caused Banc to breach said agreement. The FAC alleges: Defendants "engaged in conduct to cause Banc to unilaterally change the rights and terms

26

of Class B shares in 2017 without any notice to or approval by plaintiffs which was a breach of Plaintiffs' Warrant Agreement and the Registration Rights Agreement." Part of the issue here is that the wording of the FAC does not specify if it is referring to the Registration Rights Agreement that forms Schedule III of the Subscription Agreement (actually entitled Subscription Agreement with *Registration Rights* and Indemnification Rights dated July 16, 2010) versus the Registration Rights Agreement that is Annex III to the Consulting Agreement (entitled Consulting and Expense Agreement with Warrant Agreement, *Registration Rights* and Indemnification Rights dated July 16, 2010).

Similarly, the FAC does not differentiate which Warrant Agreement it is referring to, as both the Consulting Agreement (entitled Consulting and Expense Agreement *with Warrant Agreement*, Registration Rights and Indemnification Rights dated July 16, 2010) and the Warrant Agreement (entitled Warrant to Purchase Common Stock dated November 1, 2010) include the relevant wording in the title and may apply. At no point in the FAC do plaintiffs specify any short cite or abbreviated form to the agreements to the effect of Warrant Agreement or Registration Rights Agreement.

We find it telling, however, that the FAC's exhibits totaling 636 pages include the Subscription Agreement (with Schedule III entitled Registration Rights) and *not* the Consulting Agreement (with Annex III called Registration Rights Agreement). We find the Subscription Agreement's "Registration Rights" agreement is the only document in the FAC's voluminous exhibits that plausibly includes the registration rights with which plaintiffs alleged tortious interference.

In addition, plaintiffs' FAC cites many provisions directly from the Subscription Agreement. For instance, the FAC provides: "In addition to the Indemnification Agreement, Mr. Sugarman is also entitled to indemnification *under the Subscription Agreement* dated May 3, 2010, and amended July 19, 2010, between Banc and COR Capital, Mr. Sugarman's company." (Italics added.) The FAC also directly cites sections (g)(i) and (h) of Schedule III of the Subscription Agreement, i.e., Registration Rights. In fact, plaintiffs twice refer to the fee provision of the Subscription Agreement in the FAC: 1) "All costs incurred to collect *the fees owed to Mr. Sugarman under the* Separation Indemnification Agreement and *Subscription Agreement* are covered and to be paid by Banc to Mr. Sugarman pursuant to such agreements. Latham & Watkins reasonably incurred legal fees and expenses in connection with its representation of Mr. Sugarman. . . ." (italics added); 2) "Mr. Sugarman is also entitled to *recovery of his necessary and reasonable legal fees and expenses under the* Separation Indemnification Agreement, *Subscription Agreement*, and Consulting Agreements *incurred in connection with his need to enforce his rights under these agreements*." (Italics added.) This is indicative that the dispute, to some extent, regards the Subscription Agreement.

Moreover, the declaration of Banc's attorney Jonathan C. Sanders, filed in support of defendants' reply to their fee motion, included as exhibits plaintiffs' discovery responses. Relevant for our purposes, in response to defendants' second set of special interrogatories No. 32 requesting plaintiffs to "[i]dentify the document that YOU contend is the 'registration rights agreement'

reference[d] in Paragraph 210[2] of the First Amended Complaint," plaintiffs' response served on September 25, 2023 provides: "While Responding Party lacks access to Banc's records which may contain further, other, and different registration rights agreements, Responding Party identifies not less than the agreement embodied in Annex III to the Amended and Restated Consulting and Expense Agreement, dated May 3, 2010, **and *the various subscription agreement[s] which are all believed to include additional relevant registration rights*.**" Plaintiffs' sworn discovery response identifies "subscription agreements" which undoubtedly includes the Subscription Agreement dated July 16, 2010, and its Registration Rights attachment.

Plaintiffs' admission directly connects their cause of action for their tortious interference with contract to the Subscription Agreement. This special interrogatory response stands in direct contradiction to what plaintiffs claim in their opposition to the fee motion, as well as on appeal. It is well-established that "a party cannot create an issue of fact by a declaration which contradicts his prior discovery responses." (*Shin v. Ahn* (2007) 42 Cal.4th 482, 500, fn. 12; *Whitmire v. Ingersoll-Rand Co.* (2010) 184 Cal.App.4th 1078, 1087; see *Preach v. Monter Rainbow* (1993) 12 Cal.App.4th 1441, 1451 [the trial court may give "great weight" to admissions made in discovery and "disregard contradictory and self-serving affidavits of the party."].)

To no avail, plaintiffs also make much of the fact that the Subscription Agreement is between Banc and COR Capital, whereas the Consulting Agreement is between Banc and COR

---

[2] The FAC's paragraph 210 is under the heading "**Fraud and Breach of the Warrant Agreement and Registration Rights Agreement**."

Advisors.  Plaintiffs' differentiation fails.  The express language of the Subscription Agreement and its Registration Rights Agreement (Schedule III to the Subscription Agreement) includes the following provisions: Section (h) of the Registration Rights provides that the "agreements set forth in this Schedule III shall . . . be *binding upon the successors* and assigns of each of the parties to the Agreement, including without limitation and *without the need for an express assignment or assumption, direct and indirect transferees of Subscriber's Registrable Securities to whom the Registrable Securities have been validly transferred under the terms of the Agreement*."  (Italics added.)  The agreement gave the subscriber, i.e., COR Capital, the right to assign or validly transfer its "Registrable Securities" to another, "without the need for an express assignment."  As relevant here, the trust became the successor-in-interest to Banc's contracts with both of Sugarman's business enterprises, COR Capital and COR Advisors.  Thus, the agreement is binding onto the successor trust, i.e., plaintiff.  Similarly, section 10.3 of the Subscription Agreement states in part, "Except as otherwise provided herein, *this Agreement shall be binding upon and inure to the benefits of the parties hereto and their heirs, executors, administrators, successors, legal representatives and assigns*.  If the Subscriber is more than one person, the obligation of such Subscriber shall be joint and several and the agreements, representations, warranties, covenants, and acknowledgements herein contained shall be deemed to be made by and binding upon each such person and his or her heirs, executors, administrators, *successors* and legal representatives."  (Italics added.)

Given the extremely broad and unambiguous language of the attorney fee provision in the Subscription Agreement, coupled with the wording of and exhibits to plaintiffs' FAC, as well as plaintiffs' discovery responses, we find the litigation between the parties is a dispute "regarding" the Subscription Agreement.

The attorney fees provision applies.

D. ***Defendants May Enforce the Attorney Fee Provision as Agents of Banc.***

Plaintiffs argue that defendants "**lack standing to enforce the [Subscription Agreement's] fee shifting provision**" and that nonsignatories like defendants cannot "invoke a fee provision based on mere agency principles." Plaintiffs contend California case law does "not suggest that individuals who become mere agents years after the contracts are entered into can 'stand in the shoes' of their principles for the purposes of fee provisions."

As a general rule, such attorney fees are awarded only when the lawsuit is between signatories to the contract. (*Cargill*, *supra*, 201 Cal.App.4th at p. 966.) However, two situations may entitle a nonsignatory party to attorney fees. (*Ibid*.) "First is where the nonsignatory party 'stands in the shoes of a party to the contract.' Second is where the nonsignatory party is a third party beneficiary of the contract." (*Ibid*.)

Here, plaintiffs argue defendants "were sued as if they *were strangers to the contract, not signatories*." (Italics added.) They contend defendants "lack standing to invoke the [Subscription Agreement's] fee provision *because they do not 'stand in the shoes' of Banc*." (Italics added.)

31

First of all, this Court of Appeal previously rejected plaintiffs' argument that defendants were strangers to the Subscription Agreement. "It is a rule of general application that all questions and issues adjudicated on a prior appeal are the law of the case upon all subsequent appeals and will not be reconsidered." (*Allen v. California Mut. Building & Loan Ass'n* (1943) 22 Cal.2d 474, 481.) This doctrine also applies "[w]hen the appellate court issues an alternative writ . . . and the cause is decided by a written opinion. The resultant holding establishes law of the case upon a later appeal from the final judgment." (*Kowis v. Howard* (1992) 3 Cal.4th 888, 894; *Nelson v. Tucker Ellis LLP* (2020) 48 Cal.App.5th 827, 838.)

Via its July 6, 2023 order following defendants' writ petition, this Court of Appeal ordered the trial court to vacate its order overruling defendants' second demurrer to the FAC's fourth cause of action for tortious interference with contract and to issue a new order sustaining the demurrer because defendants stood in the shoes of Banc and were not strangers to the agreements between Banc and plaintiffs, thus defeating the fourth cause of action as a matter of law. The July 6, 2023 order reviewed applicable case law (*Mintz v. Blue Cross of California* (2009) 172 Cal.App.4th 1594; *Shoemaker v. Myers* (1990) 52 Cal.3d 1; *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503; *Woods v. Fox Broadcasting Sub., Inc.* (2005) 129 Cal.App.4th 344; *Collins v. Vickter Manor, Inc.* (1957) 47 Cal.2d 875) and concluded that current and/or former officers, directors, and employees of Banc cannot be sued as strangers to a contract to which Banc was a party. (See *Shoemaker*, at pp. 24–25 [agents were "vested with the power to act for the employer (rightly or wrongly)" and "stand in the place of the employer,

32

because the employer . . . cannot act except through such agents"]; see *Mintz*, at p. 429 [it is thus "settled that 'corporate agents and employees acting for and on behalf of a corporation cannot be held liable for inducing a breach of the corporation's contract.' "].)  The Court of Appeal found "an agent 'acting for and on behalf of' the corporate principal simply refers to an agent who took the questioned actions in the course of their role with the corporation. . . .  Whether the agent is motivated by a potential personal benefit does not nullify the agency or otherwise render the agent a stranger to the contract."

Defendants are thus entitled to the benefit of the Subscription Agreement's fee-shifting provision because, as we previously held, defendants stand in Banc's shoes in the underlying dispute regarding the Subscription Agreement.  (See *Cargill, supra*, 201 Cal.App.4th at p. 966 [a nonsignatory party is entitled to attorney fees "where the nonsignatory party 'stands in the shoes of a party to the contract.' "].)

In their opening brief Plaintiffs neither address nor mention this Court's July 6, 2023 order and analysis.  In their reply brief, they cursorily claim defendants' "law-of-the-case argument is . . . meritless" and that the writ decision "did not adjudicate [defendants'] ability to invoke the [Subscription Agreement's] fee provision.  Instead, the Court [of Appeal] addressed . . . an entirely different issue with respect to entirely different contracts (*i.e.,* the Consulting Agreement's Registration Rights Agreement and Warrant Agreement)."

Plaintiffs are incorrect in surmising that the writ decision was based on the Consulting Agreement and not the Subscription Agreement; the writ decision was based on plaintiffs' claim for tortious interference with contract, and as explained in detail

33

above, the FAC fails to adequately identify which Registration Rights Agreement and/or Warrant Agreement it refers to in its allegations.  Moreover, plaintiffs fail to recognize that the writ decision's legal conclusion that defendants are not strangers to the contract and stand in the shoes of their corporate principal (Banc) can and does apply to the Subscription Agreement.  Not only did we find that the Subscription Agreement's "Registration Rights" agreement was the only document in the FAC's 636 pages of exhibits that included the registration rights with which plaintiffs alleged tortious interference, but also plaintiffs' own response to special interrogatory No. 32 identified not just the Consulting Agreement but also "various *subscription agreements* which are all believed to include additional relevant registration rights" in reference to paragraph 210 of the FAC under the heading "***Fraud and Breach of the Warrant Agreement and Registration Rights Agreement.***"  Plaintiffs' contrary argument fails.

Additionally, during oral argument, plaintiffs relied heavily on *Reynolds Metal Co. v. Alperson* (1979) 25 Cal.3d 124, which addressed the factors to be considered when a non-signatory stands in the shoes of a signatory to a contract.  The *Reynolds* elements, as described by plaintiffs, were neither raised nor discussed below throughout trial court proceedings.  Plaintiffs' opposition to defendants' motion for attorney fees did not analyze the *Reynolds* factors.  Plaintiffs' supplemental opposition does not even cite to *Reynolds*.  Plaintiffs did not raise the *Reynolds* elements to the trial court at the hearings held March 21, 2024 and April 18, 2024.  While plaintiffs briefed this issue in their reply brief on appeal, they did not discuss it in their opening brief either.  A litigant forfeits an appellate argument by failing to

34

raise it before the trial court; we find it is belatedly raised and forfeited. (*Quiles v. Parent* (2018) 28 Cal.App.5th 1000, 1013 [" 'Failure to raise specific challenges in the trial court forfeits the claim on appeal.' "]; *Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2008) 163 Cal.App.4th 550, 564 [" ' " [I]t is fundamental that a reviewing court will ordinarily not consider claims made for the first time on appeal which could have been but were not presented to the trial court.' Thus, 'we ignore arguments, authority, and facts not presented and litigated in the trial court. Generally, issues raised for the first time on appeal which were not litigated in the trial court are waived.' " ' "]; *Mepco Services, Inc. v. Saddleback Valley Unified School Dist.* (2010) 189 Cal.App.4th 1027, 1049 [same].)

E.   ***The Trial Court Did Not Abuse its Discretion in Refusing to Apportion the Fee Award.***

Defendants sought to recover 539.6 hours of fees in connection with work performed "research[ing] and briefing relat[ed] to the April 6, 2022 demurrer" to the 167-page FAC—this amounted to $401,396 in attorney's fees. McDonald's declaration confirms that none of that time was included in defendants' prior fee motion as prevailing parties in connection with their anti-SLAPP motion.

Plaintiffs argue defendants should "not be entitled to any of $401,396 in fees incurred on the April 6, 2020 demurrer" because defendants "did not meet their burden to apportion the fees incurred on the tortious interference claim from the fees incurred on the seven other unrelated claims that were at issue on the April 6, 2020 demurrer." Plaintiffs contend "apportionment is required because the [Subscription Agreement's] fee provision only covers disputes 'regarding' the [Subscription Agreement]."

35

Plaintiffs contend the trial court erred in awarding fees on the April 6, 2020 demurrer and request that we reverse the fee award and reduce it by $401,396.

We review a trial court's decision whether to apportion attorney fees under the abuse of discretion standard. (*Heppler v. J.M. Peters Co.* (1999) 73 Cal.App.4th 1265, 1297 (*Heppler*).)

In its ruling issued on April 18, 2024, the trial court "reiterate[d] the language of the relevant fees clause" and found the "dispute regards the Agreement. It resulted in litigation. The prevailing party is entitled to all its fees, not only those incurred regarding one cause of action."

We agree with the trial court's ruling. Apportionment would be appropriate only if defendants were entitled to recover fees on certain claims and not others; plaintiffs argue, "*[w]hen fees are recoverable on only some claims and not others*, the fees must be apportioned, unless the issues are 'inextricably intertwined.'" (Italics added.) However, the attorney fees provision in the Subscription Agreement does not specify that fees are recoverable on some claims and not others; it is extremely broadly worded and expansive, and plainly read, is not limited to fees incurred in connection with only the fourth cause of action for tortious interference with contract.

The Subscription Agreement's fee provision provides: "In the event of *a dispute regarding this Agreement that results in litigation* or arbitration, the prevailing party, as determined by the finder of facts, shall be *entitled to an award of reasonable attorneys' fees*." (Italics added.) Applying the ordinary rules of contract interpretation, the fee provision does not require an individual "claim" or "cause of action" in a dispute to regard the Subscription Agreement for the fee provision to apply; it only

requires a "dispute" regarding the Subscription Agreement which "results in litigation." The only limitation set forth by the fee provision is that the fees awarded must be "reasonable." Plaintiffs' interpretation would hold water if the fee provision qualified or limited the award of attorney fees like so: "In the event of a dispute regarding this Agreement that results in litigation or arbitration, the prevailing party, as determined by the finder of facts, shall be entitled to an award of reasonable attorney fees *solely for claims regarding or enforcing the Subscription Agreement*."

Plaintiffs' reliance on *Heppler* is misplaced. There the prevailing party sought fees pursuant to Civil Code section 1717, which authorizes fees only on a claim to enforce contract, not tort, claims. (*Heppler*, *supra*, 73 Cal.App.4th at p. 1296 [citing Civil Code section 1717 and finding "[t]he subcontract specifically provides for recovery of *attorney fees incurred to enforce the contract*"].) (Italics added.) Plaintiffs' reliance on *Estate of Goldberg v. Goss-Jewett Company, Inc.* (C.D. Cal., Oct. 12, 2016, No. EDCV 14-1872 DSF (SHx) 2016 WL 7479344 is similarly misplaced. Defendants in that case moved for attorney fees arguing that "the *contract along with Civil Code § 1717* entitles them to fees as prevailing parties on the contract." (*Id.* at p. *1.) Defendants in that case "ma[de] no attempt to differentiate fees incurred in relation to the contract claim from any of the other claims in the case" and only "[a]fter plaintiffs opposed [defendants'] motions by noting that *§ 1717 generally only entitles a prevailing party on a contract claim to fees incurred that were related to the contract claim* . . . [did defendants] shift[] [their] argument to a broad interpretation of the attorney's fee provision that [defendants] claim allows to recover any and all fees for any

37

suit between [them]." (Italics added.)  (*Ibid*.)  The district court did "not consider this theory" as it was "first raised in the reply." (*Ibid*.)

We find no abuse of discretion by the trial court with respect to its decision not to apportion the fees pertaining to the April 6, 2020 demurrer.

## DISPOSITION

The trial court's order granting defendants' motion for attorney fees is affirmed.  Costs awarded to defendants.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, P. J.

We concur:

WILEY, J.

VIRAMONTES, J.